NOT DESIGNATED FOR PUBLICATION

No. 127,215

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

WILLIAM J. RAINE,
*Appellant.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE BROWN, judge. Oral argument held May 12, 2026. Opinion filed August 14, 2026. Affirmed.

*Emily Brandt*, of Kansas Appellate Defender Office, for appellant.

*Kristi D. Allen*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before BRUNS, P.J., SCHROEDER and GARDNER, JJ.

PER CURIAM: William J. Raine appeals his convictions in the Sedgwick County District Court for possession of methamphetamine and possession of drug paraphernalia. Before trial, he moved to suppress evidence found when officers stopped and frisked him. He argued that the law enforcement officers lacked reasonable suspicion that he was committing a crime, and he denied that the officers' safety concerns permitted them to frisk him for weapons. After the district court denied that motion, Raine was convicted as charged at a bench trial. After careful review, we affirm the district court's denial of Raine's motion to suppress.

1

FACTS

In the evening of January 26, 2019, Raine was in the parking lot of an apartment complex in Wichita. While driving by, Officers Marque Jameson and Joey Houston with the Wichita Police Department were on normal patrol and noticed him standing in the parking lot. They turned around and pulled into the complex.

Officer Jameson testified that he was familiar with the complex and knew that it had "a lot of issues as far as criminal activity and things like that." Jameson stated that when they drove by the complex, they saw Raine in the parking lot, and then they saw him move toward an apartment door when they pulled into the lot. Jameson explained that he

> "noticed [Raine] was kinda hangin' out in the parking lot initially, so we turned around and pulled in there. And then that's when he started to walk to, I believe it was, room number 16 and started to knock on the door, which is common for people over there, when they see us, to act like they're trying to contact someone."

Because of the criminal activity, the complex's owner had signed a "trespass affidavit" with the police department, which allowed police "to act on [the owner's] behalf to address the people that were hangin' out, trespassing, things like that in the parking lot, without having to actually have [the owner] on the scene with [officers]." Before seeing Raine in the parking lot, the officers knew that the owner of the apartment complex had recently signed a trespass affidavit.

The officers testified that the complex also had "no trespassing" signs posted on its smoke shop, although Raine said he did not see them.

2

When the officers pulled into the parking lot, Raine started to walk to room number 16 and knock on its door. Jameson knew that apartment 16 "was known to have a lot of traffic coming and going."

The bodycam footage shows that as the officers pull into the complex, Raine is facing the door of the apartment with his hands in his coat pockets. As the officers get out of their patrol vehicle, Raine turns, takes his hands out of his pockets, and walks calmly towards the officers. The video does not contain any audio during the initial encounter.

The officers testified that they then asked Raine what he was doing there and he responded that he was looking for a female who stayed in apartment 16. But the officers knew the sole occupant of apartment 16 was a middle-aged Hispanic male. Raine soon changed his statement and told the officers he was there to see an older Hispanic male. But at the evidentiary hearing, Raine denied having told the officers that he was looking for a woman. Instead, he testified he was at the apartment to see its male resident, an acquaintance of his, because he had found a car and wanted to see whether the resident might be interested in buying it.

Jameson testified that because Raine kept moving to put his hands in his pockets, he decided to frisk him. During the pat down, Jameson felt an object that he recognized because of his training and experience to be a meth pipe in one of Raine's jacket pockets. The officers then arrested Raine. During the search incident to arrest, the officers located another methamphetamine pipe and a baggie with a clear or white crystalized substance inside, which was later identified as methamphetamine.

The State charged Raine with one count of possession of methamphetamine, a severity level 5 drug felony, in violation of K.S.A. 21-5706(a), (c)(1), and one count of possession of drug paraphernalia for use, a class B nonperson misdemeanor, in violation of K.S.A. 21-5709(b)(2), (e)(3). Raine was not charged with trespassing.

3

Raine moved to suppress the evidence derived from the stop. His motion argued that the search was unconstitutional because the officers had no reasonable suspicion that he was engaged in illegal activity and no reasonable suspicion that he was armed and dangerous. He thus argued that the fruits of the search should be excluded.

At the conclusion of the evidence and parties' arguments, the district court orally denied the motion to suppress, finding reasonable suspicion to support the initial stop and the frisk. After the district court denied his motion to suppress, Raine waived his right to a jury trial, and the parties tried the case to the bench. The district court judge found Raine guilty as charged. For Raine's possession of methamphetamine conviction, the district court sentenced him to 12 months' probation and suspended 22 months of imprisonment. For Raine's possession of paraphernalia conviction, the district court sentenced Raine to 12 months' probation and suspended a 6-month jail sentence.

Raine timely appeals, challenging solely the district court's denial of his motion to suppress.

ANALYSIS

I.  *Did the district court err by finding reasonable suspicion supported the initial stop?*

Raine first asserts that the officers lacked reasonable suspicion that he was committing a crime, had committed a crime, or was about to commit crime.

*Standard of Review*

When a defendant moves to suppress evidence, the State must prove by a preponderance of the evidence that the search and seizure was lawful. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006). When reviewing a district court's ruling on a

motion to suppress, an appellate court reviews the factual findings for substantial competent evidence and the court's ultimate legal conclusion de novo. *State v. Doelz*, 309 Kan. 133, 138, 432 P.3d 669 (2019). Similarly, "[w]hether reasonable suspicion exists is a question of law, and appellate courts review this question with a mixed standard of review, determining whether substantial competent evidence supports the district court's factual findings, while the legal conclusion is reviewed de novo." *City of Wichita v. Molitor*, 301 Kan. 251, 264-65, 341 P.3d 1275 (2015). We apply the bifurcated standard here.

Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. Smith*, 312 Kan. 876, 887, 482 P.3d 586 (2021). In reviewing the factual findings, an "appellate court does not reweigh the evidence or assess the credibility of witnesses." *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). The State carries the burden to prove the search and seizure were lawful. K.S.A. 22-3216(2); *State v. Cash*, 313 Kan. 121, 126, 483 P.3d 1047 (2021).

*General Legal Principles*

We generally recognize four types of encounters between individuals and police: (1) voluntary or consensual encounters, (2) investigatory detentions, (3) public safety stops, and (4) arrests. *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016). These encounters must not violate the individual's constitutional rights. The Fourth Amendment to the United States Constitution and section 15 of the Kansas Constitution Bill of Rights prohibit unreasonable searches and seizures. The United States Supreme Court has interpreted this prohibition to require law enforcement officers who seize or search an individual to either have a warrant or rely on a recognized exception to the warrant requirement. *State v. Sanders*, 310 Kan. 279, 285, 445 P.3d 1144 (2019) (citing *Riley v. California*, 573 U.S. 373, 382, 134 S. Ct. 2473, 189 L. Ed. 2d 430 [2014]). One of these

recognized warrant exceptions is a "'stop and frisk.'" *State v. Sanchez-Loredo*, 294 Kan. 50, 55, 272 P.3d 34 (2012).

The parties agree that Raine was subjected to a "*Terry* stop and frisk"—an investigatory detention. See *Terry v. Ohio*, 392 U.S. 1, 12, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). For a stop and frisk to not run afoul of an individual's constitutional right to be free of unreasonable searches and seizures, the stopping officer must have a reasonable and articulable suspicion, based upon facts known before the stop, that the person is committing, has committed, or is about to commit a crime. See *State v. Toothman*, 267 Kan. 412, 416-18, 985 P.2d 701 (1999); *State v. Gross*, 39 Kan. App. 2d 788, 184 P.3d 978 (2008). Put another way, "an officer may seize or stop an individual even if lacking probable cause to arrest the individual as long as the officer has a reasonable suspicion of criminal activity. And under some circumstances the officer may frisk the individual." *State v. Andrade-Reyes*, 309 Kan. 1048, 1053, 442 P.3d 111 (2019).

*Terry* allows a stop and frisk if two conditions are met:

"First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326-27, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009).

Reasonable suspicion is a lower standard than probable cause, and what is reasonable depends on the totality of the circumstances in the view of a trained law enforcement officer. *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017). Reasonable suspicion is more than a mere hunch. *State v. Lowery*, 308 Kan. 359, 366, 420 P.3d 456 (2018).

6

The reasonable suspicion analysis uses an objective standard rather than a subjective standard based on the officer's personal belief. *Cash*, 313 Kan. at 130. "In determining whether reasonable suspicion exists, the court must judge the officer's conduct in light of common sense and ordinary human experience under the totality of the circumstances." *Sharp*, 305 Kan. at 1081. An appellate court defers to a trained officer's ability to distinguish between innocent and suspicious circumstances. 305 Kan. at 1081. To show reasonable suspicion for an investigatory stop, the State need not rule out the possibility that the suspect is engaged in innocent conduct. See *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000).

*Law enforcement had reasonable suspicion that Raine was committing, had committed, or was about to commit a crime.*

Raine first argues that the officers lacked reasonable suspicion to stop him, claiming that standing in a high-crime area is insufficient. The State counters, including in its analysis Raine's changing story. But we will not consider the testimony that Raine changed his story from looking for a female to looking for a male in determining whether officers had reasonable suspicion to stop Raine, because Raine allegedly made this statement *after* the officers had initially stopped him. As stated above, an officer must have a reasonable and articulable suspicion, based upon facts known *before* the stop, that the person is committing, has committed, or is about to commit a crime. See *Toothman*, 267 Kan. at 416-18; *Gross*, 39 Kan. App. 2d at 804. Although this rule is more difficult to apply here than in a routine traffic stop, we omit that factor from our analysis in an abundance of caution. We include it, however, in our analysis of the frisk.

In determining reasonable suspicion, we use an objective standard based on the totality of the circumstances, rather than a subjective standard based on the officer's personal belief. This objective standard requires us to ask whether the facts available to

7

the officer at the moment of the stop would warrant a person of reasonable caution to believe the stop was appropriate.

"The reasonable suspicion analysis requires use of an objective standard based on the totality of the circumstances, not a subjective standard based on the detaining officer's personal belief. See *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996) (justification for investigatory detention not based upon officer's subjective motivations); *United States v. Sanchez*, 555 F.3d 910, 922 (10th Cir. 2009) (finding irrelevant under an objective standard whether the officer intended to arrest the defendant for some other crime than the crime ultimately charged); *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998) (concluding an officer's subjective intent to arrest the defendant for a particular offense is immaterial for analyzing search incident to arrest; search justified if objective facts would have supported arrest for an offense). So the relevant question for the district court at a suppression hearing is whether the *facts presented* to the officer—facts to which the officer must testify with particularity—give rise to an objective basis for suspecting criminal activity when viewed under the totality of the circumstances standard. See *Terry*, 392 U.S. at 21-22 (noting that the objective standard of reasonable suspicion requires the court to ask whether the facts available to the officer at the moment of seizure or search would warrant a person of reasonable caution to believe the search or seizure was appropriate); *Jones*, 300 Kan. at 645 (an officer is not required to neatly package the reasonable suspicion factors in a single succinct answer; the court is required to consider 'the totality of the circumstances, all facts and inferences, [and] not a select few')." *Cash*, 313 Kan. at 130.

Thus in *Cash*, the Kansas Supreme Court rejected the defendant's argument that the court could not consider a baggie and a safe in its reasonable suspicion calculus because the officer had not testified that she collectively considered the two of them to be suspicious. 313 Kan. at 130-32. We use that analysis here as well.

Raine contends, and we agree, that "mere presence in a high-crime area standing alone is insufficient to create reasonable suspicion." *State v. Anguiano*, 37 Kan. App. 2d 202, 207, 151 P.3d 857 (2007); *Wardlow*, 528 U.S. at 124 (holding that "[a]n individual's

presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime").

But we have more facts here than Raine's mere presence in a high-crime area. And we must consider them.

> "An appellate court is obligated to defer to what a district court reasonably discerns from recorded evidence, such as a videotape of an interrogation or a dash cam of a traffic stop. . . . Again, the court is required to view the evidence presented in a totality of the circumstances context by considering all facts and inferences, not a select few in isolation. See *Jones*, 300 Kan. at 645." *Cash*, 313 Kan. at 131-32.

We thus look to the facts presented to the officers—facts to which the officers testified with particularity—and reasonable inferences known to the officers at the time of the stop to determine whether they gave rise to an objective basis for suspecting criminal activity when viewed under the totality of the circumstances standard. See *Cash*, 313 Kan. at 130.

*The Facts Here*

Both Officer Jameson and Officer Houston testified that they were familiar with the apartment complex before this stop. They knew it had "a lot of issues as far as criminal activity and things like that." Officer Houston testified: "We've had a—we had a lot of issues on this property, to the extent that there was multiple nuisance abatements out on the property, due to previous criminal history that occurred there, significant crimes."

The officers knew that because of the criminal activity there, the complex's owner had recently signed a "trespass affidavit" with the police department. They understood that this document allowed them "to act on [the owner's] behalf to address the people that were hangin' out, trespassing, things like that in the parking lot," without having to have

9

the owner on the scene with them. The complex's owner had also posted "no trespassing" signs on the premises.

When the officers drove by the complex, Jameson saw Raine and noticed he was "kinda hangin' out" in the parking lot, so the officers turned around and pulled into the apartment complex. Jameson testified that Raine was just hanging out and that he wasn't going anywhere in particular *until* he saw the marked patrol car drive by. But when the patrol car turned around, Raine started going towards apartment 16, where he started to knock on the door. It is reasonable to infer from these facts that Raine stopped whatever he was doing in the parking lot and moved toward a particular apartment because he saw the officers pull into the parking lot.

Jameson testified that this move was both common and pretextual. "[That] is common for people over there, when they see us, *to act like* they're trying to contact someone." (Emphasis added.) The fact that the officers had seen similar behavior before by people at the apartment complex in response to the officers' presence gives rise to a reasonable inference that the officers found Raine's pretextual acts evidenced a consciousness of guilt. See generally *State v. Cathey*, 241 Kan. 715, 730, 741 P.2d 738 (1987) (evidence to establish the defendant's consciousness of guilt such as flight, concealment, fabrication of evidence, or the giving of false information is admissible as evidence in a criminal case), *disapproved of on other grounds by State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006). It is thus reasonable to infer from the facts that Raine approached apartment 16 not because he had prior intent to contact its occupant, but because he wanted to make police think he was there for a legitimate purpose—Raine was trying to hoodwink the officers.

Jameson knew that apartment 16, the door Raine was knocking on, "was known to have a lot of traffic coming and going." It is reasonable to infer from the facts above that the traffic known to the officers was related to crimes—they would have no reason to

10

know about other traffic coming and going from apartment 16. So even if Raine's act of knocking on the door to that apartment was not pretextual but was to visit its occupant, the officers' degree of suspicion would have been raised by the fact that Raine was knocking on that particular door.

K.S.A. 21-5808, which criminalizes trespass, states:

> "(a) Criminal trespass is entering or remaining upon . . . :
> (1) Land . . . by a person who knows such person is not authorized or privileged to do so, and:
>
> . . . .
>
> (B) such premises or property are posted as provided in K.S.A. 32-1013, and amendments thereto, or in any other manner reasonably likely to come to the attention of intruders, or are locked or fenced or otherwise enclosed, or shut or secured against passage or entry."

Officer Jameson's testimony establishes that the premises were posted with "no trespassing" signs "when you first pull into the parking lot." Those signs were thus "reasonably likely to come to the attention of intruders," such as Raine. Raine thus knew or should have known that he was not authorized to enter or remain on that property.

But the relevant inquiry is not whether Raine's conduct violated the trespass ordinance or any other law.

> "'The relevant inquiry is not whether particular conduct is "innocent" or "guilty," but whether a sufficient degree of suspicion attaches to particular types of noncriminal acts. [Citation omitted.] The totality of the circumstances standard precludes a "divide-and-conquer analysis" under which factors that are "readily susceptible to an innocent explanation [are] entitled to 'no weight.'" [Citations omitted.]' *Schooler*, 308 Kan. at 352 (quoting *State v. Sharp*, 305 Kan. 1076, 1081-82, 390 P.3d 542 [2017])." *Cash*, 313 Kan. at 133.

11

"The totality of the circumstances standard does not envision a reviewing court pigeonholing each factor as to innocent or suspicious appearances. Instead, the court determines whether all the circumstances [objectively] justify the detention." *State v. Schooler*, 308 Kan. 333, 352, 419 P.3d 1164 (2018). In the reasonable suspicion context, officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). The officers did so here.

Considering the totality of the circumstances—all facts and inferences, and not a select few—we find substantial competent evidence supporting the district court's factual findings. And those facts support the legal conclusion, reviewed de novo, that the officers had an objective, reasonable suspicion that Raine was committing, had committed, or was about to commit a crime, allowing them to approach Raine to request information.

II.    *Did the district court err by finding that law enforcement had reasonable suspicion that their safety was at risk, permitting them to frisk Raine?*

Raine next contends that the officers lacked reasonable suspicion to frisk him. The State counters that the frisk was legal because Raine kept putting his hands in his pockets, giving rise to officer safety concerns.

Routine searches for weapons without reasonable suspicion that the person subjected to the pat-down is dangerous are not permitted: "Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons' . . . . The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked." *Ybarra v. Illinois*, 444 U.S. 85, 93-94, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979).

12

Under the stop-and-frisk exception, an officer conducting an investigative stop may pat down a person for weapons if the officer reasonably suspects doing so is necessary for the officer's safety. See K.S.A. 22-2402(2) ("When a law enforcement officer has stopped a person for questioning . . . and reasonably suspects that such officer's personal safety requires it, such officer may frisk such person for firearms or other dangerous weapons."); *Johnson*, 555 U.S. at 326-27 (stating "to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous"); *State v. Bannon*, 306 Kan. 886, 892, 398 P.3d 846 (2017).

Still, the need to conduct a limited search for weapons must be supported by more than a mere hunch; it requires a particularized and objective basis for the suspicion. See *State v. Pollman*, 286 Kan. 881, Syl. ¶ 4, 190 P.3d 234 (2008) (defining reasonable suspicion). "[T]he State need not establish that the officer was absolutely certain that the individual was armed. Rather, the issue is whether a reasonably prudent person in the circumstances would be warranted in the belief that his or her safety or that of others was in danger." *State v. Dean*, 42 Kan. App. 2d 558, Syl. ¶ 5, 214 P.3d 1190 (2009).

Raine argues that he was merely acting nervously and he instinctively started to put his hands back in his pockets but stopped himself each time. An individual acting nervously, alone, does not create reasonable suspicion to support a frisk. *Dean*, 42 Kan. App. 2d at 567. But refusing to comply with an officer's commands about where to keep one's hands can create reasonable suspicion. See, e.g., *United States v. Weaver*, 9 F.4th 129, 147 (2d Cir. 2021) (defendant made movements towards waist band three times). And "refusing to obey an officer's order to keep one's hands in plain sight may support an obstruction charge," which requires the much higher burden of probable cause. *State v. Beltran*, 48 Kan. App. 2d 857, 877, 300 P.3d 92 (2013); see *Sharp*, 305 Kan. at 1081 (discussing standard of reasonable suspicion as lower than probable cause). The district court found Raine's act of trying to put his hands in his pockets after officers told him not to supported the need for the frisk.

13

The objectively reasonable facts available at the time of the pat-down showed that by the time the officers frisked Raine, they had several reasons for concern about their safety. First, the officers knew that they were in a high-crime area at night, that the particular complex they were at had significant and recent crime, and that apartment 16 had lots of traffic coming and going from it, including Raine. Second, the officers knew that Raine had changed his story about what he was doing at apartment 16. He initially stated that he was there to look for a female, yet the officers knew that room was occupied by only a Hispanic male. Then Raine said that he was there to see an older Hispanic male. Although Raine testified to the contrary that his stated reason for being at that apartment never changed, our scope of review compels us to refrain from reweighing the evidence, assessing witness credibility, or resolving conflicts in the evidence. *State v. Wash*, 320 Kan. 646, 685, 571 P.3d 568 (2025). Raine's stated purpose for being there was suspect. Cf. *State v. Norwood*, 217 Kan. 150, 155, 535 P.2d 996 (1975) (false exculpatory statement made by defendant shows consciousness of guilt). Third, the officers did not know Raine before this encounter. And the occupant of apartment 16 told the officers that he did not know Raine either. Only after the officers arrested Raine did that occupant say he recognized Raine.

Most importantly, Jameson testified that Raine's continued movements toward his pants pockets—not toward his jacket pockets where his gloves were—made them question their safety. At the evidentiary hearing, Jameson testified that while he was talking with Raine, he "continued to put his hands in his pockets," and Jameson had "asked him not to do that, just because I didn't know if he had anything on him that would hurt me." Jameson testified that after "several times" of Raine putting his hands in his pockets he "just went ahead and decided to pat him down, make sure he didn't have anything so that he would be okay with keeping his hands in his pockets." Jameson said the pat down was prompted by his concern for officer safety. On cross-examination, Jameson testified that Raine tried to put his hands in his pants pockets "two different times, at least, on video."

14

The video confirms the officer's testimony. It shows that as Raine walks towards the officers, he brings his right hand toward his waistband. An officer's hand points towards Raine's hand and then Raine moves both of his hands upwards with his palms facing up before dropping both hands to his sides. Raine then turns his upper torso slightly to gesture back to apartment 16, while apparently speaking with the officers. He then twists his upper torso to face the officers and moves both hands as if he is going to put them in his pants pockets but then crosses his arms in front of his body instead. The audio begins and the officer states, "Keep your hands out of your pockets please." The officer then states, "Let me just pat you down so you don't keep doing that." Jameson then patted Raine down.

These facts are sufficient to warrant a reasonably prudent officer in the belief that his safety was in danger.

Affirmed.